UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

FREDDIE JAMES MCDOUGAL, JR.,

        Plaintiff,

    v.                                  Case No. 18-cv-1218-bhl

JANINE MONTOYA, et al.,

        Defendants.

---

## DECISION AND ORDER

---

Plaintiff Freddie James McDougal, Jr., who is serving a state prison sentence at the Green Bay Correctional Institution and representing himself, filed this action pursuant to 42 U.S.C. §1983, alleging that his civil rights were violated while he was housed at the Milwaukee County Jail. McDougal is proceeding on Fourteenth Amendment claims based on allegations that Defendants unreasonably dismissed his concerns about his food allergy and delayed getting him medical treatment for his subsequent allergic reaction.[1] McDougal and Defendants filed cross-motions for summary judgment. Dkt. Nos. 109, 115. The motions are fully briefed and ready for the Court's decision.

### BACKGROUND

On October 29, 2017, McDougal entered the Milwaukee County Jail, where Defendants Monique Penn (previously Chambliss), Amanda DeBerry, and Janine Montoya worked as

---

[1] On February 17, 2021, the Court dismissed Brandon Decker and Samantha Markwardt as Defendants because, based on the unopposed facts, the only reasonable conclusion was that McDougal failed to exhaust the available administrative remedies before he sued those Defendants. Further, dismissal was appropriate as a sanction for McDougal's failure to comply with the local rules and the Court's order regarding his obligation to respond to Decker and Markwardt's motions.

correctional officers. During intake, McDougal reported to medical staff that he is allergic to beans and peanuts. The nurse performing the intake assessment completed a restricted diet order form directing that McDougal's diet exclude beans. According to Defendants, restricted diet orders last for ninety days. Inmates wishing to continue receiving a restricted diet must renew their requests before the order expires.[2] McDougal asserts that he was not informed of this requirement during intake. Dkt. No. 116 at ¶¶1, 4-12, 27, 30-31; Dkt. No. 134 at ¶31.

Aramark Correctional Services, LLC delivers preassembled meals to the Jail. After receiving a restricted diet order form for an inmate, Aramark provides a substitute meal whenever the meal planned for the general population includes an inmate's allergen as an ingredient. Correctional officers are not involved in preparing meals for the inmates; they merely oversee the inmates while they collect their meal trays, eat, and then return their empty trays to the rack. If there is a problem with a meal, a correctional officer can call the kitchen to try and resolve the problem. Dkt. No. 116 at ¶¶39-43.

Penn was working on February 17, 2018 and oversaw the distribution of lunch trays on McDougal's unit. According to McDougal, he asked Penn if there was a special tray for him or if it was ok for him to eat the general population tray. McDougal asserts that he told Penn he is allergic to beans and peanuts and that it was not obvious from looking at the food whether it contained beans. Penn allegedly refused to call the kitchen and told him, if there is no special tray on the cart, then he has to eat what everyone else eats. Dkt. No. 116 at ¶6; Dkt. No. 1 at 3[3]; Dkt. No. 134 at ¶46.

---

[2] McDougal does not seek to state a claim based on this policy (nor could he state such a claim against any of the remaining Defendants), but like McDougal, the Court questions the logic and/or wisdom of this policy and urges the Jail to consider what penological purpose is served by requiring inmates with severe food allergies to update their requests for a restricted diet every ninety days.

[3] McDougal's verified complaint is considered an affidavit in support of his summary judgment motion and of his opposition to Defendants' summary judgment motion. *Ford v. Wilson*, 90 F.3d 245, 246-47 (7th Cir. 1996).

McDougal asserts that he started to eat the food on the tray, but near the bottom of his stew he found a bean. McDougal asserts that he asked Penn to call either health services or the kitchen. She eventually called and was told that McDougal's restricted diet based on his allergy had expired and he needed to submit a new request form. Penn asserts that she does not remember talking to McDougal about his lunch that day, nor does she remember any change to his condition after he ate the bean. McDougal agrees that his allergic reaction was mild that day and that he went to sleep after lunch. Dkt. No. 1 at 3-4; Dkt. No. 116 at ¶¶47-52.

According to McDougal, the next day, on February 18, 2018, he had a swollen face and lips and hives. He slept until the afternoon, so Penn did not see McDougal during her shift. At about 4 p.m., he left his cell and asked a corrections officer (not a Defendant) to call a medical emergency, which she did. McDougal was examined shortly thereafter and given some medication. He returned to his cell to go back to sleep. Dkt. No. 1 at 4; Dkt. No. 116 at ¶53-59.

McDougal asserts that, the next day, on February 19, 2018, DeBerry conducted an early morning inspection of the unit along with a trainee officer. DeBerry recalls observing McDougal's swollen lip and asking him if he needed medical treatment, but she says that McDougal declined. She asserts that he did not seem to have any trouble talking. McDougal asserts that DeBerry's recollection is false; he asserts that he went to his cell door and told her he was having an allergic reaction and asked her multiple times to call a medical emergency, but she declined. DeBerry asserts that McDougal spent most of the day in the dayroom waiting for a phone call. McDougal asserts that this too is false. According to McDougal, he never left his cell and spent the day sleeping. A little before 2 p.m., after McDougal had asked DeBerry multiple times to call a medical emergency and after he told her he "couldn't breathe," she called a medical emergency and McDougal was taken to the health services clinic. Dkt. Nos. 116, 134 at ¶¶60-68, 72-73.

3

The following day, on February 20, 2018, at about 7:30 a.m., Montoya asserts that she noted McDougal's lip was swollen, and she told him she would contact medical for him. According to Montoya, McDougal was standing, speaking, and did not appear to be in physical distress. To the contrary, McDougal asserts that he asked Montoya multiple times to call a medical emergency and that she told him to stop talking during wristband inspection. He states that he told her his condition was worse and that he could not eat. According to McDougal he spent most of his time in his cell, and the only time he was observed was when he asked that a medical emergency be called. Dkt. Nos. 116, 134 at ¶¶75-76.

At about 8:30 a.m. two nurses arrived on the unit to conduct wellness exams and medication pass. McDougal asserts that from his doorway they told him they would try to get him seen by a doctor. Defendants assert that McDougal was being disorderly, so rather than lining up with the other inmates, he was instructed to return to his cell. Montoya states that she called health services to ask someone to examine McDougal. She noted in the unit log that, at 9:33 a.m., she was still waiting for medical to call back. While McDougal was locked in his cell, he repeatedly pushed his intercom button to ask for medical assistance. Montoya asserts that McDougal was angry because he was locked in his cell, but McDougal insists her explanation does not make sense given that he had not left his room in two days because he felt unwell. Later that day, after being examined by a doctor, McDougal was sent to the hospital, where he stayed for two days. Dkt. Nos. 116, 134 at ¶¶77-86; Dkt. No. 1 at 4, 6-7.

**LEGAL STANDARD**

Summary judgment is appropriate when the moving party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the Court must view the evidence

4

and draw all reasonable inferences in the light most favorable to the non-moving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). In response to a properly supported motion for summary judgment, the party opposing the motion must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

McDougal, who was a pretrial detainee at the time, asserts that Penn violated his constitutional rights when she refused to verify whether it was safe for him to eat his food and then failed to get him medical attention after he discovered a bean in his food. He also asserts that DeBerry and Montoya violated his constitutional rights when they delayed calling for medical assistance despite his worsening condition and his persistent requests that they call a medical emergency. Defendants deny McDougal's claims, insisting they acted appropriately under the circumstances and conditions then apparent to them.

Although Defendants acknowledge that McDougal's claims arise under the Due Process Clause of the Fourteenth Amendment, they position their argument with reference to the deliberate indifference standard of the Eighth Amendment. Dkt. No. 117 at 8, n. 1. But deliberate indifference is not the correct standard. Under *Miranda v. County of Lake*, claims like McDougal's

5

are subject to the objective unreasonableness standard. 900 F.3d 335, 352 (7th Cir. 2018). Thus, to prevail on his claim, McDougal must first show that Defendants "acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of [his] case." *McCann v. Ogle County, Ill*., 909 F.3d 881, 886 (7th Cir. 2018) (citations omitted). A showing of mere negligence or even gross negligence will be insufficient. *Id.* Next, he must show that Defendants' conduct was objectively unreasonable. *Id.* The focus is on "the totality of the circumstances" Defendants faced and whether their response was reasonable without regard to any subjective belief they may have held. *Id.*

With regard to Penn, a jury must decide whether her refusal to call the kitchen or health services to confirm whether it was safe for McDougal to eat his lunch was objectively reasonable. On the one hand, a jury could conclude that it was reasonable for Penn to rely on Aramark to provide food trays consistent with a particular inmate's food restrictions. As she explained to McDougal, in her experience, if a general population food tray is provided to an inmate, then it is safe for the inmate to eat the food. It would be time-consuming and disruptive to her duties if she called the kitchen to verify that each inmate was receiving the correct tray, so her decision not to do so for McDougal could be assessed as merely negligent. On the other hand, a jury could conclude that, faced with McDougal's statements that he usually receives a restricted diet tray, that he has a severe bean allergy, and that it was unclear whether his "stew" contained beans, it was objectively unreasonable for her not to follow up with the kitchen to confirm that he could eat the food without risk to his health and safety. Given that a question exists whether Penn's decision was reasonable in light of the totality of the circumstances, neither party is entitled to summary judgment on this claim.

Penn is, however, entitled to summary judgment on McDougal's claim that she acted unreasonably after he notified her that he found a bean in his stew. The parties agree that McDougal immediately placed a call (it is not clear if it was to the kitchen or health services) and learned that the order for McDougal's restricted diet had expired. Further, they agree that his allergic response immediately after he ate the bean was "mild," so immediate medical treatment was not necessary. It appears that it was unknown at that time how severe McDougal's allergic response would be. Given that he was having little to no reaction immediately after eating his lunch, a jury could not conclude that Penn's refusal to call a medical emergency was unreasonable. Further, Penn did not see McDougal in the days after he consumed the beans, and she is not responsible for others' failure to address his worsening condition. *See Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (citing *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983) for the proposition that "[a]n individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation").

The claims against DeBerry and Montoya also raise questions of fact for a jury. Depending on whose version it believes, a reasonable jury could conclude that DeBerry and Montoya failed to respond in an objectively reasonable manner to McDougal's persistent requests for medical attention. The parties agree that, for hours, DeBerry and Montoya both dismissed McDougal's insistence that he needed immediate medical care. But, according to DeBerry, delaying a call to health services was reasonable because, while McDougal's lip was swollen, he did not appear to be in any distress and had no trouble talking or moving as he spent most of the day in the dayroom. DeBerry notes that he called health services as soon as McDougal's condition worsened to a point where McDougal stated he could not breathe. Similarly, Montoya asserts that she noticed McDougal's swollen lip, but otherwise he did not seem in distress. She asserts that McDougal

7

initially said he did not need medical attention and, despite repeatedly pressing his intercom button, he never said his condition was an *emergency*. In any event, Montoya asserts that she called health services and was waiting for their response. Were a jury to credit DeBerry and Montoya's version, it could conclude that their decision to wait to contact health services was reasonable. But McDougal presents a very different version of what happened those two days.

According to McDougal, he was too sick to leave his cell and spent most of the two days after he ate the contaminated lunch sleeping. He asserts that his face and lips were swollen and that, for at least part of the time, his arms were covered in hives. He states that he could not swallow and that his throat got tighter over time. McDougal explains that the only time Defendants observed him was when he left his cell to inform them that, despite receiving some medication, his condition was getting worse. He asserts that he repeatedly asked them to get him medical attention, but they either ignored him or failed to impress upon health services the severity of his worsening condition. McDougal also presents evidence that because his condition worsened over time, when he finally was seen by a doctor and sent to the hospital, he had to receive fifteen or more injections and had to stay in the hospital for two days. Dkt. No. 1 at 6. Given the unpredictability and severity of some food allergies, a jury that credited McDougal's version could conclude that DeBerry and Montoya's decision to delay alerting health services of McDougal's worsening condition was unreasonable. Because there are material disputes between the parties' versions of what happened, both motions for summary judgment must be denied.

Finally, contrary to Defendants' assertion, they are not entitled to qualified immunity. Government officials will be shielded from civil liability for conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982)). "An officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it,' meaning that 'existing precedent . . . placed the statutory or constitutional question beyond debate.'" *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015) (alteration in original) (citations omitted). This standard protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Defendants emphasize that "[c]orrections officers are trained to call the Master Control unit to report a medical emergency when an inmate appears [to] show signs of serious injury or sudden illness of a nature or severity that could result in death or serious harm." Dkt. No. 117 at 17. This training is consistent with well-established precedent that officers cannot ignore serious risks to an inmate's health and safety but must seek to bring such a condition to the attention of medical professionals. *See Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005) (explaining that a non-medical official cannot ignore a prisoner's complaints but must investigate them and refer them to a medical provider who can address his concerns). Defendants assert that they are entitled to qualified to immunity because McDougal did not present with complaints serious enough to warrant immediate medical attention, but whether he did is a question of fact that a jury must consider. Defendants are not entitled to qualified immunity.

## CONCLUSION

For these reasons, Defendants' motion for summary judgment (Dkt. No. 115) is **GRANTED** in part and **DENIED** in part as described in this decision, and McDougal's motion for summary judgment (Dkt. No. 109) is **DENIED**. The Court will schedule a telephonic status

9

conference to discuss next steps. If the parties want to pursue mediation, they may file a **joint** request that this case be referred to a magistrate judge for that purpose.

**SO ORDERED** at Milwaukee, Wisconsin this 27th day of October, 2021.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge